IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| RICHARD MARK TURNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 03-048-SLR |
| | ) |
| CORRECTIONAL MEDICAL, | ) |
| SERVICES, WARDEN THOMAS L. | ) |
| CARROLL, and LT. DOWNING, | ) |
| | ) |
| Defendants. | ) |

Richard Mark Turner, pro se Plaintiff.

Kevin J. Connors, Esquire, of Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, Delaware. Counsel for Defendant Correctional Medical Services.

Ophelia Michelle Waters, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Warden Thomas L. Carroll and Lt. Downing.

**MEMORANDUM OPINION**

Dated: March 27, 2007
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

Presently before the court are motions for summary judgment filed by State defendants Warden Thomas L. Carroll ("Warden Carroll") and Lt. Downing ("Downing") (D.I. 236, 237), defendant Correctional Medical Services ("CMS") (D.I. 240. 241), and plaintiff Richard Mark Turner ("Turner") (D.I. 253, 254). Responses and replies were filed by plaintiff and defendants. (D.I. 244, 246, 250, 251, 256, 263, 271) Also before the court is plaintiff's motion for a ruling on the motions for summary judgment and to expedite court date and motion to strike delinquent medical expert affidavit. (D.I. 266, 272) For the reasons set forth below, the court will grant the State defendants' motion for summary judgment and will grant Warden Carroll summary judgment sua sponte. (D.I. 236) The court will grant in part and deny in part CMS' motion for summary judgment, and the court will grant in part and deny in part plaintiff's motion for summary judgment (D.I. 240, 253). The court will deny as moot the motion to rule on the motions for summary judgment and will deny the motion to strike delinquent medical expert affidavit. (D.I. 266, 272)

## II. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff filed this § 1983 lawsuit on October 11, 2002, against numerous defendants alleging that the medical care he received during his incarceration at the Delaware Correctional Center ("DCC") violated his Eighth and Fourteenth Amendment rights under the U.S. Constitution. Plaintiff notified the court on June 28, 2006 that he had been released from DCC. (D.I. 225) The court was notified by plaintiff on February 5, 2007 that he is currently incarcerated at the Centre County Correctional Facility,

Bellefonte, Pennsylvania. (D.I. 268)

Plaintiff has maintained a detailed log of his medical care since April 19, 2000. (D.I. 74) He has Hepatitis C, among other medical conditions, and alleges that he was not provided adequate medical care. Plaintiff was prescribed Interferon to treat the Hepatitis. He alleges that he did not receive appropriate training to self-administer the Interferon injections and, as a result, he improperly self-injected in the same site. He also alleges that medical staff did not stop him from injecting in the same site. Plaintiff alleges that the repetitive injections in the same site resulted in a serious skin infection. He also alleges that the skin infection was treated inappropriately. Finally, plaintiff alleges that he was not provided with special medical diets as prescribed by his physicians. Several defendants have been dismissed from the case and those who remain are Warden Carroll, Downing, and CMS.

On August 20, 2003, the court issued a memorandum opinion and order dismissing defendants PHS and the Delaware Department of Correction. (D.I. 79, 80) The court also dismissed the claims against Warden Carroll and Downing in their official capacities. Id. On December 18, 2003, the court granted summary judgment in favor of defendant First Correctional Medical ("FCM") and its employees, and found that there was nothing in the record to suggest that these defendants acted with deliberate indifference to plaintiff's medical needs. (D.I. 110)  In turn, plaintiff filed a notice of appeal of the memorandum order, and a motion to reargue the decision. (D.I. 112, 113) On January 16, 2004, for the reasons stated in the December 18, 2003 memorandum order, the court entered judgment in favor of defendant FCM and its employees, and

2

against plaintiff. (D.I. 116) The court denied plaintiff's motion for reargument on February 12, 2004 and, at the same time, stayed the case pending plaintiff's appeal to the U.S. Court of Appeals for the Third Circuit. (D.I. 123) On March 1, 2004, the appeal was dismissed for failure to timely prosecute, Turner v. CMS Corr. Med. Ser., No. 04-1056 (3d Cir. Mar. 1, 2004), and the stay was lifted. (See D.I. 125, 126) The court entered a scheduling order setting discovery and dispositive motion deadlines on March 31, 2004. (D.I. 126) On the same day, plaintiff filed a motion for relief from judgment, which was denied on July 16, 2004. (D.I. 131, 147) A few days after the issuance of the discovery scheduling order, the State defendants moved to stay discovery. (D.I. 133) Discovery deadlines were extended several times throughout the pendency of the case . (D.I. 146, 167)

Plaintiff filed a motion to reconsider the denial of the motion for relief from judgment. (D.I. 150) That motion was denied on November 4, 2004. (D.I. 173) On November 16, 2004, the court entered an order denying plaintiff's motion to amend the complaint, having determined that plaintiff could not add claims regarding medical treatment provided since March 2004. (D.I. 177) Plaintiff was advised that he should file a new civil rights action for any such claims.[1] Id. Accordingly, the relevant time period in this case runs from approximately October 11, 2000 through February 29, 2004.[2]

_____

[1]Plaintiff filed a new case in this district on February 10, 2006, Turner v. Correctional Medical Services, Civil Action No. 06-95-SLR.

[2]The complaint was received by the court for filing on October 11, 2002, but was signed by plaintiff on October 1, 2002. In Delaware, § 1983 claims are subject to a two-year limitations period.

3

On June 15, 2005, the court again stayed the case pending the results of a review by the Federal Civil Panel regarding appointment of counsel for plaintiff. (D.I. 194) The stay was lifted on May 5, 2006, after an unsuccessful attempt to find a lawyer willing to represent plaintiff. (D.I. 214) On May 22, 2006, plaintiff filed two motions for reconsideration; one based upon the order of dismissal dated August 20, 2003, and the other based upon the order granting summary judgment to certain defendants on December 18, 2003. (D.I. 218, 219) Both motions for reconsideration were denied on July 20, 2006. (D.I. 231)

On May 24, 2006, Dr. Ivens, Dr. Jaffri, Nurse Practitioner Melody Thorpe, and Nurse Bob Davenport were dismissed for failure to timely serve pursuant to Fed. R. Civ. P. 4(m). (D.I. 220) In the same order the court noted that, despite the voluminous filings by plaintiff, the record lacked certain documents; for example, the record was devoid of medical records from CMS. Id. The order detailed that the missing medical records were to be provided by the remaining defendants and, on July 17, 2006, the State defendants and CMS submitted the documents. (D.I. 227, 229)

## III. DISCUSSION

### A. Standard of Review

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could

4

alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment sua sponte." Couden v. Duffy, 446 F.3d 483, 500 (3d Cir. 2006) (quoting Gibson v. Mayor and Council of Wilmington, 355 F.3d 215, 222 (3d Cir. 2004)). This may not occur, however, "without 'placing the adversarial party on notice that the court is considering a sua sponte summary judgment motion' and providing that party 'an opportunity to present relevant evidence in opposition to that motion.'" Coudon, 446 F.3d at 500 (other citations omitted). Notice is satisfied if

5

"the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." Id. (other citations and quotation marks omitted).

Defendants Warden Carroll and Downing move for summary judgment on the bases that there is no genuine issue as to any material fact, and the record is devoid of any evidence of their deliberate indifference to plaintiff's medical needs. Defendant CMS moves for summary judgment on the bases that the claims against it are barred by the two year limitations period, and there were no policies or conduct by it to demonstrate a deliberate indifference to plaintiff's serious medical needs. CMS also argues that any state law claims fail because plaintiff did not comply with the statutory requirements of medical negligence as set forth in 18 Del. Code § 6801(7). Plaintiff filed summary judgment against CMS on the bases that CMS did not timely file its motion for summary judgment, and that it ignored discovery orders. In his motion, plaintiff makes specific argument on the issue of CMS' alleged deliberate indifference to his serious medical needs. Therefore, the court also construes plaintiff's motion as seeking summary judgment on his substantive claims, noting that CMS has thoroughly addressed the substantive issue, both in its motion for summary judgment and in its response to plaintiff's motion for summary judgment.

## B. Medical Needs Claim

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison

6

officials that indicate deliberate indifference to that need. Estelle v. Gamble, 429 U.S. at

104; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately

indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails

to take reasonable steps to avoid the harm. Farmer v. Brennan, 511 U.S. 825, 837

(1994). A prison official may manifest deliberate indifference by "intentionally denying

or delaying access to medical care." Estelle v. Gamble, 429 U.S. at 104-05.

However, "a prisoner has no right to choose a specific form of medical

treatment," so long as the treatment provided is reasonable. Poole v. Taylor, 466

F.Supp.2d 578, 589 (D. Del. 2006) (citing Harrison v. Barkley, 219 F.3d 132, 138-140

(2d Cir. 2000)). An inmate's claims against members of a prison medical department

are not viable under § 1983 where the inmate receives continuing care, but believes

that more should be done by way of diagnosis and treatment and maintains that options

available to medical personnel were not pursued on the inmate's behalf. Estelle v.

Gamble, 429 U.S. at 107. Moreover, allegations of medical malpractice are not

sufficient to establish a constitutional violation. White v. Napoleon, 897 F.2d 103, 108-

09 (3d Cir. 1990) (citations omitted); see also Daniels v. Williams, 474 U.S. 327, 332-34

(1986) (negligence is not compensable as a constitutional deprivation). Finally, "mere

disagreement as to the proper medical treatment" is insufficient to state a constitutional

violation. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

### 1. Defendants Warden Carroll and Downing

Plaintiff alleges that he wrote numerous letters to Warden Carroll and, to the best

of his knowledge, Warden Carroll did nothing to investigate his complaints or to rectify

the problems plaintiff was having with medical. (D.I. 2 ¶ II.F.) Plaintiff alleges that

7

Downing refused to comply with physicians' orders when he failed to provide special diets tailored to plaintiff's dietary restrictions. (D.I. 190)

Warden Carroll and Downing's motion for summary judgment speaks only to the issue of the alleged failure to provide plaintiff with a special diet. State defendants make no reference to plaintiff's allegations that Warden Carroll was aware of the serious problems plaintiff encountered in obtaining medical treatment and, despite his knowledge, Warden Carroll did nothing. Relying upon previous orders entered by the court, Warden Carroll and Downing posit that the court determined no evidence exists to support plaintiff's deliberate indifference to medical needs claims on their part. More particularly, Warden Carroll and Downing rely on the court's denial of plaintiff's motion for reconsideration of an order granting summary judgment to defendants FCM and its employees. (D.I. 232) Notably, the court's memorandum order did not discuss the allegations against Warden Carroll and Downing but, rather, discussed the allegations made against FCM and its employees. Additionally, the relevant time period for the claims against FCM occurred from July 1, 2002 through February 29, 2004, and the claims raised against Warden Carroll and Downing include dates prior to July 1, 2002. Therefore, defendants' reliance on the court's prior orders is misplaced.

A § 1983 plaintiff must establish that supervisory officials participated in, or had personal knowledge of and acquiesced in, the actions which are alleged to have constituted a constitutional deprivation. Atkinson v. Taylor, 316 F.3d 257, 271 (3d Cir. 2003) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). As noted above, the motion for summary judgment focuses solely upon the special needs diet issue, and does not move for summary judgment on the allegations that plaintiff advised

8

Warden Carroll of his serious medical condition, the medical department did not provide treatment, and that Warden Carroll did nothing to assist plaintiff.

In his opposition to the motion for summary judgment, plaintiff provided the court with letters written to Warden Carroll on April 3, 2002 and August 19, 2002, and made argument regarding Warden Carroll's alleged personal knowledge of, and acquiescence in, the alleged constitutional violations. The correspondence indicates that, contrary to plaintiff's assertions, Warden Carroll responded to plaintiff's concerns.

In the April 3, 2002 letter, plaintiff makes medical complaints to Warden Carroll about CMS. Warden Carroll did not ignore the letter, but acknowledged it by memorandum dated April 5, 2002, confirming that he had received plaintiff's letter regarding medical issues and forwarded the matter to Georgia Perdue of CMS for her information, review, and action. The record also contains a memorandum from Warden Carroll dated May 22, 2002, acknowledging that he had received plaintiff's letter regarding medical issues; but it is unclear to which letter Warden Carroll refers. Significantly, in an August 19, 2002 letter, plaintiff thanks the Warden for any help he may have been in assisting plaintiff to obtain proper medical care and for the positive changes he had made with the food service.

Rather than exhibiting deliberate indifference to plaintiff's medical conditions, the evidence before the court demonstrates that Warden Carroll took action. He forwarded letters on to CMS so it could address plaintiff's medical needs. And, by plaintiff's admission, the Warden helped plaintiff with medical care and changes in the food service. The court finds there is no issue of fact and that Warden Carroll is entitled to judgment as a matter of law. Plaintiff thoroughly addressed the issue and provided

9

numerous documents to support his claim. Indeed, as can be seen by the record that contains 272 docket entries and more than one thousand pages of exhibits, plaintiff has been given every opportunity to present relevant evidence on the issue. Accordingly, the court grants summary judgment sua sponte to Warden Carroll on the issue of deliberate indifference to plaintiff's medical needs.

State defendants move for summary judgment on the special diet issue arguing that, rather than fail to provide plaintiff with a special diet, plaintiff periodically disagreed with the special diet that was made available to him. Conversely, plaintiff argues that, on several occasions, defendants failed to provide diets ordered by medical personnel and, on numerous occasions, defendants dictated to the medical staff what diets they would or would not honor for plaintiff. Plaintiff also contends that Downing dictated to the medical staff what he would and would not honor for plaintiff's special dietary concerns.

The record reflects that during the relevant time period, on numerous occasions special needs were medically ordered for plaintiff. A diet request form was submitted on September 7, 2001, to expire on December 7, 2001. (D.I. 244 Ex. A) A computer generated inmate diet report attached to Downing's affidavit contains a comment section which states that plaintiff was discharged by medical on December 13, 2001; a special diet was resubmitted on December 30, 2001, and plaintiff was discharged by medical on February 20, 2002; the diet was reactivated on May 30, 2002, and the diet was discontinued on September 6, 2002. (D.I. 183 Ex. A1) Diabetic and special needs diets were ordered for plaintiff on July 25, 2002, to expire on October 25, 2002. (D.I. 244 Ex. C) The records indicate that a diabetic diet request form was submitted on

10

September 6, 2002, to expire in 90 days. Id. New orders were given on October 3, 2002 for a special diet, and to fax the diet order to the kitchen. Id. A diet request was received from medical on November 18, 2002, January 30, 2003, February 25, 2003, March 27, 2003, and May 16, 2003; the diet was updated by medical on August 11, 2003, changed by medical on September 11, 2003, and updated by medical on October 3, 13, and 21, 2003, and December 30, 2003. (D.I. 183 Ex. A1) The medical records indicate that a renal diet was ordered on September 8, 2003, to expire on December 9, 2003, and a special needs diet was ordered on October 9, 2003 for a maximum of 90 days. (D.I. 244 Ex. C) Finally, a diet request from medical was received on March 23, 2004, and the diet was updated on March 31, 2004 and June 24, 2004. (D.I. 183 Ex. A1)

The documents submitted by plaintiff refer to three instances when he was not provided with a special needs diet. Plaintiff submitted a request for medical services on August 17, 2002, indicating that he had spoken to the nutritionist on July 24, 2002 and a special diet was ordered but, when he asked that it be honored, plaintiff was told by Downing that "we won't do that here". Id. Plaintiff states that, after he told Downing that he had spoken to the Warden, Downing said "they hadn't received the order yet." Id. Plaintiff goes on to state that he spoke to an individual who showed him the order and said it had been sent but, as of August 16, 2002, plaintiff had yet to receive his special diet. Id. Plaintiff also had difficulties with his special diet in September 2002. On September 14, 2002, plaintiff submitted a request for medical services asking that his special diet be reestablished. (D.I. 244 Ex. C) On September 24, 2002, plaintiff submitted a sick call slip complaining that every day he was told at the kitchen that the

11

paperwork for his diet had yet to be received. Id. He submitted another sick call slip on September 27, 2002, making the same complaint. Id. On that date, plaintiff states, "if you will just fax my diet to Lt. Downing he will make sure I get it." Id. The last mention of difficulties with a special diet is contained in progress notes dated February 19, 2003 which state that "kitchen doesn't provide any special high fiber diet so will D/C."[3] (D.I. 250) There is no indication that plaintiff made a complaint about the failure to receive a high fiber diet.

Downing disputes plaintiff's allegations. (D.I. 183 Ex. A) During the relevant time period, although he was a food services supervisor at DCC, Downing avers that he was in charge of inmate payroll and scheduling and did not handle or become involved with matters concerning an individual's special dietary requests and/or orders. Id. He states that during the relevant time period, special diet requests were handled by the food service supervisor in charge of special diets. Id.

Downing's affidavit states that plaintiff's diet report indicates that food services received requests for special diets for plaintiff. Id. The affidavit states that medical discontinued the special diet due to plaintiff's non-compliance, and that the percentage of special diets plaintiff "picked-up" was far below a 61% compliance. Id.

Plaintiff can establish deliberate indifference by showing that prison officials intentionally interfered with his medical treatment. See Estelle v. Gamble, 429 U.S. at 105. It is clear that special diets were ordered for plaintiff. While plaintiff argues that special diets were not consistently provided to him, the record indicates that, except for

---

[3]Presumably this means "discontinue."

a few occasions, plaintiff's special dietary needs were met. Indeed, the record contains only one instance when plaintiff made a specific complaint against Downing for his failure to provide a special needs diet, and that occurred in July 2002. When plaintiff made his second complaint in September 2002, he makes reference to Downing but it is not in the context of a complaint. Rather, he asks that a newly ordered diet be faxed to Downing who, plaintiff states, will make sure he receives the diet.

For the most part, plaintiff was provided the medical diets he required. When looking at the entire relevant time period and the few times a special diet was not provided, the record does not support a finding of deliberate indifference to serious medical needs. Even viewing the evidence in the light most favorable to plaintiff, the State defendants' actions do not rise to the level of an Eighth Amendment violation. Therefore, the court will grant the State defendants' motion for summary judgment on the issue of the special needs diet.

## 2. Defendant CMS

CMS provided medical services at DCC from July 1, 2000 until June 30, 2002. Plaintiff alleges that during this time-frame, CMS was deliberately indifferent to a serious medical need because he was improperly trained in the administration of Alpha-Interferon chemotherapy used to treat Hepatitis C. Specifically, plaintiff alleges that he was not trained to rotate the injections, and he unknowingly self-injected in the same spot three times per week for seven months, which resulted in a serious staph infection. Plaintiff also alleges that complications ensued following the staph infection and that CMS exhibited deliberate indifference when it did not treat the complications with urgency.

13

CMS moves for summary judgment on the bases that plaintiff's claims are barred by the two-year limitations period, CMS had no policies that demonstrate deliberate indifference to plaintiff's serious medical needs, and there was no conduct by CMS to demonstrate CMS was deliberately indifferent to plaintiff's serious medical needs. CMS also argues that any state law claims fail because plaintiff has not complied with the statutory requirements of medical negligence as set forth in 18 Del. Code § 6801(7).

### a. Statute of Limitations

CMS provided medical services at DCC from July 1, 2000 until June 30, 2002. CMS argues that claims for care and treatment that occurred more than two years prior to October 11, 2002 (i.e., October 11, 2000), are barred by the two-year limitations period. Plaintiff concedes the limitations issue to the extent that the conduct giving rise to his constitutional claims occurred during CMS' tenure from October 11, 2000 until June 30, 2002. (D.I. 253 at 10)

For purposes of the statute of limitations, § 1983 claims are characterized as personal injury actions. Wilson v. Garcia, 471 U.S. 261, 275 (1983). In Delaware, § 1983 claims are subject to a two-year limitations period. See 10 Del. Code § 8119; McDowell v. Delaware State Police, 88 F.3d 188, 190 (3d Cir. 1996). Claims not filed within the two-year statute of limitations period are time-barred and must be dismissed. See Montgomery v. DeSimone, 159 F.3d 120, 127 (3d Cir. 1998).

The computation of time for complaints filed by pro se inmates is determined according to the "mailbox rule." In Houston v. Lack, 487 U.S. 266 (1988), the United States Supreme Court held that a prisoner's notice of appeal of a habeas corpus petition was deemed filed as of the date it was delivered to prison officials for mailing to

14

the court. While Houston dealt specifically with the filing of a habeas appeal, the decision has been extended by the Court of Appeals for the Third Circuit to other prisoner filings. See Burns v. Morton, 134 F.3d 109, 112 (3d Cir. 1998). Additionally, this district has extended the Houston mailbox rule to pro se § 1983 complaints. Gibbs v. Decker, 234 F.Supp. 2d 458, 463 (D. Del. 2002). See also Rivers v. Horn, 2001 WL 312236, at *1 n.1 (E.D. Pa. March 29, 2001) (extending Houston to pro se prisoner § 1983 complaints).

Here, plaintiff's complaint was signed on October 1, 2002, and the envelope it was mailed in is post-marked October 9, 2002. Therefore, plaintiff's complaint was delivered to prison authorities for mailing some time between October 1, 2002 and October 9, 2002. Giving plaintiff the benefit, the court concludes that plaintiff's complaint was filed on October 1, 2002, the date it was signed, and the earliest date possible that it could have been delivered to prison officials in Delaware for mailing.

Accordingly, any claims brought by plaintiff for the alleged wrongful conduct of CMS that occurred before October 1, 2000, are barred by the two-year limitations period. Thus, the court will grant CMS' motion for summary judgment for claims filed against it arising prior to October 1, 2000.

### b. Constitutional Violations

CMS argues that, as a private corporation, it may only be held liable for a policy or custom that demonstrated its deliberate indifference to plaintiff's serious medical needs. CMS argues that plaintiff has failed to allege a CMS policy or custom that demonstrates deliberate indifference to a serious medical need. Also, it argues that plaintiff failed to garner any evidence that could lead to an inference that such a policy

15

or custom existed.  Conversely, plaintiff argues that CMS's failure to adequately train

him and its pattern of failing to monitor the Interferon injection treatment indicates that it

was deliberately indifferent to his serious medical needs.

    As discussed above, in order to state an inadequate medical treatment claim

under the Eighth Amendment, an inmate must allege deliberate indifference to serious

medical needs constituting "unnecessary and wanton infliction of pain."  Estelle v.

Gamble, 429 U.S. at 104.  When a plaintiff relies on the theory of respondeat superior to

hold a corporation liable, he must allege a policy or custom that demonstrates such

deliberate indifference.  Sample v. Diecks, 885 F.2d 1099, 1110 (3d. Cir. 1989); Miller v.

Correctional Med. Sys., Inc., 802 F.Supp. 1126, 1132 (D. Del. 1992).  In order to

establish that CMS is directly liable for the alleged constitutional violations, plaintiff

"must provide evidence that there was a relevant [CMS] policy or custom, and that the

policy caused the constitutional violation[s] [plaintiff] allege[s]."  Natale v. Camden

County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or

vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation

under contract with the state cannot be held liable for the acts of its employees and

agents under those theories).

    The Third Circuit has identified three situations wherein it will consider acts of

government employees, or employees of a private entity acting under color of state law,

to result from a government policy or custom, thereby rendering the entity liable under §

1983:  "[1] appropriate officer or entity promulgates a generally applicable statement of

policy and the subsequent act complained of is simply an implementation of that policy.

. .[2] no rule has been announced as policy but federal law has been violated by an act

16

of the policymaker itself. . .[3] policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Natale, 318 F.3d at 584. In Natale, the court held that an inmate's claim survived summary judgment even though there was no evidence that the medical services company had an affirmative policy or custom that prevented its employees from inquiring into the frequency with which the plaintiff required insulin, because there was evidence that the company "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." Id.

CMS argues that, since the court granted Dr. Trivedi summary judgment and determined that the medical care he provided plaintiff did not violate plaintiff's constitutional rights, it cannot be found to have been deliberately indifferent to plaintiff's serious medical needs. CMS also argues that it is clear from the medical records that plaintiff received "some medical treatment for his injection site infection." (D.I. 241) With regard to the Interferon self-injections, it argues that plaintiff concedes that one morning a nurse came in and instructed him on self-injection of the Interferon. Id.

Plaintiff argues that CMS exhibited deliberate indifference when, for a seven month period, it allowed him to inject three Interferon shots per week in the same place even though this is medically contraindicated. Plaintiff alleges that he self-injected over eighty Interferon shots in the same location. He argues that it was never explained to him that medical complications would ensue if the injection site was not rotated. Plaintiff alleges that an infection occurred at the injection site, and that the infection was a

17

serious staph infection (i.e., Methicillin-Resistant Staphylococcus Aureus), which went undiagnosed and uncultured for over three years.

Plaintiff filed a medical grievance on May 22, 2001, requesting he be treated with Interferon. (D.I. 229 Ex. B at D697)  The grievance states that plaintiff had been told in April 2000  he would receive the treatment.  Id.  CMS responded to the grievance on May 25, 2001, by stating that it had no current policy for treating inmates infected with the Hepatitis C virus, but that a plan was in the development stage.  Id. at D698.   The final answer to the grievance dated June 5, 2001 advised plaintiff that he was on the list for consideration.  (D.I. 229 Ex. E at D699)  Plaintiff was approved for Interferon treatment on November 17, 2001.  (D.I. 227 Ex. a at D59)  Progress notes dated November 30, 2001, indicate that plaintiff was advised of the benefits and side effects of Interferon treatment.  Id. at D56.  There is no mention of training on how to self-inject the Interferon.

Plaintiff's medical records indicate that CMS began the Interferon treatment on December 17, 2001.  (D.I. 227 Ex. a at D39; Ex. c at D174)  The Medicine Administration Record indicates that the Interferon was dispensed by medical personnel.  (D.I. 227 Ex. c)  The Interferon was ordered for twelve months, with injections on Monday, Wednesday, and Friday.  (D.I. 229, Ex. A at D79)

Plaintiff provided the court with product information for Interferon.  (D.I. 253 Ex. D)  Warnings include that the patient should be monitored for several conditions associated with Interferon treatment.  As to administration, "a patient should self-inject. . . only if the physician determines that it is appropriate and the patient agrees to medical follow-up as necessary and training in proper injection techniques has been given to

18

him."  Id.  The information sheet further states that the Interferon should not be injected in the same place all the time, but that the injection site should be changed each time in a regular pattern.  Id.

Plaintiff describes his instruction for self-injecting Interferon as follows: "one morning out of the blue a nurse came in at 4:00 a.m. gave me the syringe with Interferon and said your Interferon/Ribiviren treatment starts today and handed me the syringe.  I asked do I have to inject the vein and was told no that could kill me but to lift up some skin and inject under the skin."  (D.I. 72)  He goes on to states, "three days a week for seven months nurses watched me inject the same area and never told me you do not inject the same area over and over with chemotherapy."  Id.  Plaintiff learned from other inmates that they had been shown a two-hour film on the dangerousness of the treatment and what to do and what not to do.  Id.  Plaintiff asks a most relevant question, "why in over 6 months of 3 shots per week did not one C.M.S. employee stop me from injecting the same spot."  (D.I. 253 at 8)

Plaintiff submitted three requests for medical treatment in June 2002, on the eighteenth, twenty-second, and twenty-seventh.  (D.I. 227 Ex. b at D30, D31, D35; D.I. 253 at Ex. C)  He makes specific mention of an abscess on his leg where he injected Interferon and requested proper treatment by someone with experience in the area. Plaintiff was seen by Dr. Trivedi[4] on June 20, 2002, complaining that, overnight, the wound on his leg had become larger. Dr. Trivedi prescribed bacitracin ointment.  (D.I. 227 Ex. b. at D31, D74)  Plaintiff was next seen on June 26, 2002, following the June

_____

[4]The court granted Dr. Trivedi summary judgment on December 18, 2003.  (D.I. 110)

19

22, 2002 request for medical treatment.  Id. at D35.  Plaintiff was seen by Dr. Tatagari and nurse Bailey, and again given bacitracin ointment and Ibuprofen for pain.  On June 27, 2002, plaintiff complained that the swelling had worsened; when he was seen by nurse Bailey the next day, he was given antibiotics and pain medication.  Id. at D30. Progress notes for that date state that inmate "had been injecting self [with] Interferon same area."  Id. at D33.

According to CMS, its tenure with DCC ended on June 30, 2002.  After that date, a new medical contract service provider attended to the medical needs of the inmates at DCC.  Plaintiff was admitted to the infirmary on July 1, 2002, due to the leg ulcer.  Id. at D33, 34, 73.  Medical notes dated July 19, 2002 indicate that plaintiff had an abscess on the left thigh at the site of the Interferon injections.  (D.I. 227 Ex. b at D36)  The note goes on to state, "apparently pt. has been injecting at the same site everytime."  Id. The court delved through the voluminous record and found only one mention in the medical records that plaintiff was given instruction on how to inject the Interferon.  That occurred on July 8, 2002, after the end of CMS' tenure at DCC and while plaintiff was in the infirmary receiving treatment for the leg infection.  The note states, "with initial injection of treatment I/M verbalized understanding of how to inject the Interferon to this nurse."[5]  Id. at D13.

Plaintiff and CMS both submitted physician affidavits in support of their respective positions.  (D.I. 263, 271)  Dr. Ramesh K. Vemalupalli ("Dr. Vemalupalli")

---

[5]The note is a continuation of progress note from a previous page.  Curiously, neither CMS nor the State defendants included the previous page with the discovery the court ordered them to provide.

states that a patient should be educated before self-injecting Interferon, and that medical personnel should not have allowed plaintiff to inject himself at the same site. (D.I. 263) CMS' expert, Dr. Gary L. Simon ("Dr. Simon"), does not speak to the self-injection issue. Both Dr. Vemalupalli and Dr. Simon reference treatment of the infection at the injection site and, of course, their opinions differ. Also, they have a difference of opinion on whether an infection at the injection site resulted in complications that required further medical treatment and/or surgery. These conflicting opinions, however, speak to the issue of damages.

With regard to the Interferon injections, the court finds that there is no genuine issue of material fact as to whether plaintiff's Eighth Amendment right were violated. The medical literature indicates that Interferon therapy can have very serious complications and that a person who self-injects should be properly trained in the administration of the injections. The medical literature further indicates that the injections are not to be administered in the same location, but are to be rotated.

The record reflects that plaintiff received little training on the self-administration of the injections, and was never told not to inject the Interferon in the same location. Notably, CMS employees were required to dispense the Interferon to plaintiff and, it appears, were with plaintiff each and every time he self-injected, yet not one person stopped him from self-injecting in the same location. Court exhibits indicate that as of May 2001, CMS had no policy regarding the treatment of inmates with Hepatitis C. Indeed, the only evidence in plaintiff's voluminous medical record that references the issue of the plaintiff's knowledge of injecting the Interferon occurs after CMS was no longer the health care provider and while plaintiff was in the infirmary suffering from

21

complications from the consistent injections in the same location. It is evident from the continual failure to oversee the administration of Interferon therapy, that CMS health care policies either failed to address the immediate needs of inmates with the serious medical condition of Hepatitis C or that it simply turned a "blind eye to an obviously inadequate practice" that was likely to result in the violation of constitutional rights. See Natale, 318 F.3d at 584. Therefore, the court will grant plaintiff's motion for summary judgment on this issue and will deny CMS' motion for summary judgment on this issue.

Plaintiff also claims that CMS failed to urgently treat his leg infection at the injection site. The medical records indicate that plaintiff received medical attention two days after he sought treatment. The initial treatment did not resolve the problem, but CMS personnel continued to treat plaintiff each and every time he filed a request for medical treatment. Plaintiff takes issue with the type of care he received but, as stated above, a prisoner's subjective dissatisfaction with his medical care or disagreement with the CMS medical staff's judgment does not in itself indicate deliberate indifference. White v. Napoleon, 897 F.2d 103, 110 (3d Cir.1990). At most, the CMS medical staff was mistaken in their initial diagnosis and treatment of plaintiff's condition, which is a claim of medical malpractice or negligence and not an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

The facts show that plaintiff received prompt medical attention upon his complaints only days after the onset of symptoms indicating an infection. Thus, the court will grant CMS' motion for summary judgment on the issue of denial of medical care.

Plaintiff also moves for summary judgment based upon CMS' behavior during

22

this litigation. He seeks the drastic sanction of judgment by default against CMS for its dilatory discovery methods. As a general rule, motions seeking discovery sanctions are filed pursuant to Fed. R. Civ. P. 37, not Fed. R. Civ. P. 56. Regardless, the court deems judgment by default against CMS unwarranted and, therefore, will deny plaintiff's motion for summary judgment under this theory. (D.I. 253)

### c. State Law Claim

CMS moves for summary judgment to the extent that plaintiff alleges a medical negligence claim pursuant to 18 Del. Code § 6807(7). In Delaware, medical malpractice claims are governed by the Delaware Health Care Negligence Insurance and Litigation Act. 18 Del. Code § 6801(7). When a party alleges medical negligence, Delaware law requires the party to produce expert medical testimony detailing: "(1) the applicable standard of care; (2) the alleged deviation from that standard; and (3) the causal link between the deviation and the alleged injury." Bonesmo v. Nemours Foundation, 253 F.Supp.2d 801, 804 (D. Del. 2003) (quoting Green v. Weiner, 766 A.2d 492, 494-95 (Del. 2001)) (internal quotations omitted); 18 Del. Code § 6853. Delaware law requires that, at the time of filing the complaint, it be accompanied by an affidavit of merit as to each defendant signed by an expert witness. 18 Del. Code § 6853. The statute provides for a single 60 day extension for the filing of the affidavit of merit, but only upon timely motion of the plaintiff and for good cause shown.

Plaintiff did not file an affidavit of merit with his complaint. Nor did he timely file a motion for an extension of time to file an affidavit of merit. On October 4, 2006, approximately three and one-half years after the complaint was filed, plaintiff moved for the late filing of a medical expert affidavit. (D.I. 255) It is clear, however, that plaintiff

sought the additional time to file an affidavit to support/refute a motion for summary judgment. There is no indication in the motion for extension that the additional time was sought so that plaintiff could perfect a Delaware medical malpractice claim. Therefore, the court will grant CMS's motion for summary judgment as to the Delaware state claims.

## IV. CONCLUSION

Based upon the foregoing analysis, the court will grant the State defendants' motion for summary judgment and will grant summary judgment sua sponte to Warden Carroll. (D.I. 236) The court will grant in part and deny in part CMS' motion for summary judgment. (D.I. 240) The court will grant in part and deny in part plaintiff's motion for summary judgment. (D.I. 253) The court will deny as moot the motion for ruling on the motions for summary judgment and to expedite court date, and the court will deny the motion to strike delinquent medical expert affidavit. (D.I. 266, 272) An appropriate order will be entered.